UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
PETER ROST,                                                        :
                                      Plaintiff,                   :
                                                                   :  MEMORANDUM DECISION
                                                                      AND ORDER
                    - against -                                    :  05-cv-10384 (GBD)
                                                                   :
PFIZER, INC., PHARMACIA, INC., MARIE-CAROLINE                      :
SAINPY, KAREN KATEN, JEFFREY KINDLER, AND                          :
HENRY MCKINNELL,                                                   :
                                      Defendants.                  :
------------------------------------------------------------------ x

GEORGE B. DANIELS, United States District Judge:

Plaintiff commenced this action against his former employers, Pharmacia, Inc. and Pfizer, Inc., and three Pfizer executives. Plaintiff seeks to recover damages he claims to have sustained as a result of defendants' alleged violations of the New Jersey Conscientious Employee Protection Act ("CEPA"), N.J. Stat. Ann. §§ 34:19-1 *et seq.*, and New Jersey's public policy against wrongful employee termination. Plaintiff also asserts a retaliation claim against Pharmacia and Pfizer under the False Claims Act, ("FCA"), 31 U.S.C. §3729 *et seq*. Plaintiff alleges that because he voiced concerns over Pharmacia's drug marketing practices, Pfizer failed to offer him a permanent position following the companies' merger.

Defendants moved for summary judgment, seeking dismissal of plaintiff's claims in their entirety. Plaintiff cross-moved for partial summary judgment with respect to defendants' attempt to reduce any damages that plaintiff may be awarded based on misconduct plaintiff allegedly engaged in while provisionally employed by Pfizer. Defendants' summary judgment motion is granted. Plaintiff's cross-motion is denied as moot.

## MATERIAL FACTS

Plaintiff, a New Jersey resident, began working for defendant Pharmacia at its Bedminster, New Jersey location on June 25, 2001. Deposition of Peter Rost ("Rost Depo.") at 12; Declaration of Plaintiff, Peter Rost, Opposing Defendants' Summary Judgment Motion ("Rost Decl.") at ¶ 3, Plaintiff's Material facts pursuant to 56.1 ("Plaintiff's Facts") at ¶ 58. Plaintiff assumed the position of Vice President within Pharmacia's Endocrine Care Group. Id. As part of his regular job responsibilities, plaintiff oversaw the marketing of various pharmaceutical products, including a human growth hormone drug called "Genotropin". Rost Decl. at ¶ 2.

In December 2001, prior to plaintiff's joining Pharmacia, the company launched an internal investigation to review its sales and marketing practices for Genotropin, including off-label distribution of the drug. Declaration of John Houston Pope In Support of Defendants' Motion for Summary Judgment ("Houston Pope Decl."), Exhibit 2. Prior to February 2002, plaintiff was unaware of any off-label distribution of Genotropin. Rost Depo. at 115. Plaintiff testified that he learned of those improper sales and marketing practices as part of Pharmacia's internal review process. Id. at 114.

In the summer of 2002, Pharmacia and Pfizer, a New York corporation, announced their intention to effectuate a merger. Declaration of Marie-Caroline Sainpy in Support of Defendants' Motion for Summary Judgment ("Sainpy Decl.") at ¶ 3. As part of the merger transition, Pharmacia and Pfizer executives conducted numerous meetings to familiarize Pfizer with Pharmacia's business practices and products. Rost Decl. at ¶ 4. On October 10, 2002, plaintiff participated in a general business meeting involving various Pfizer and Pharmacia

product groups. Id. at ¶ 5. At that meeting, plaintiff made a twenty minute presentation on his group's sales and marketing of various drugs, including Genotropin. Id. at ¶¶ 5-7. At that time, Plaintiff did not discuss any of the improper marketing and sales issues that were the subject of Pharmacia's internal investigation. Rost Depo. at 380-86, 409.

Pfizer's Marketing Transition Coordinator first met plaintiff during his October 10, 2002 presentation. Sainpy Decl. at ¶ 6. In her affidavit, Pfizer's Marketing Transition Coordinator stated that plaintiff's presentation led her to conclude that plaintiff did not possess characteristics which would allow him to "grow and flourish within the new Pfizer organization." Id.

Plaintiff participated in a subsequent meeting on October 28, 2002 ("the Knowledge Transfer Meeting") along with, *inter alia*, members of Pfizer's legal department. Plaintiff's Facts at ¶ 66. At that meeting, plaintiff informed Pfizer employees of Pharmacia's previous Genotropin marketing programs that plaintiff believed violated federal and industry regulations. Rost Depo. at 100-03, 105. Plaintiff explained that he "had previously discussed this with Pharmacia's associate general counsel and compliance officer," and that he disagreed with their assessment that Pharmacia had ceased engaging in improper marketing activities. Complaint at ¶ 16; Rost Depo. at 101-02. Plaintiff communicated to Pfizer that "maybe not enough had been done" by Pharmacia in response to its investigation of the improper Genotropin marketing practices. Id. at 112. Plaintiff did not, however, share his concerns with any regulators, government agencies or any individuals outside of Pharmacia and Pfizer. Id. at 119. Plaintiff also did not express to anyone a belief that Pharmacia had submitted false claims to government officials or agencies. Id. at 103.

Following the Knowledge Transfer Meeting, Pfizer requested additional information on

Pharmacia's Genotropin marketing practices from Pharmacia's transition team. Plaintiff's Facts at ¶ 72; Declaration of Jon W. Green In Support of Cross-Motion for Summary Judgment ("Green Decl."), Exhibit 28. Plaintiff participated in a follow up meeting to discuss aspects of Pharmacia's former Genotropin marketing program in greater detail. Plaintiff's Facts at ¶ 72.

Pfizer's Marketing Transition Coordinator decided not to include plaintiff among the group of Pharmacia employees invited to interview for specific post-merger positions at Pfizer. Sainpy Decl. at ¶ 8. At the behest of plaintiff's then supervisor, Pfizer's transition team granted plaintiff an informational interview on December 13, 2002 to generally discuss post-merger opportunities at Pfizer's New York offices. Sainpy Decl. at ¶ 8; id. at Exhibits A and C. Although plaintiff maintains that he did not expressly limit his interest to vice president positions, he had a clear preference for employment at that level of seniority. Rost Depo. at 194. Plaintiff was not offered a post-merger position with Pfizer after his interview.

On January 7, 2003, plaintiff emailed Pfizer's Marketing Transition Coordinator to inquire as to whether Pfizer was still considering him for a post-merger position. Sainpy Decl., Exhibit B. She replied to plaintiff by email dated January 17, 2003, "My understanding is that the only type of position you are interested in considering is at the VP level. There is a very limited number of such positions and considering this level only, there will not be a fit with the Marketing Organization." Sainpy Decl. at ¶ 10, Exhibit D. Plaintiff's January 17, 2003 answer to her email included a lengthy explanation of why he believed that Pfizer should retain him to avoid legal liability for Pharmacia's prior Genotropin marketing practices. He advised, "If you lose key company memory and competence you will have a greater difficulty protecting your legal interests and demonstrating to the courts that you took appropriate action if charges would

-4-

be filed against you." Id., Exhibit F at 1. Plaintiff went on to describe the "legal exposure" of Pharmacia's Endocrine Care Group and predictions about Pharmacia's potential corporate liability for improper Genotropin marketing activities that Pharmacia's Associate General Counsel had shared with him. Id. Plaintiff further recommended that the Marketing Transition Coordinator "create a Senior Vice President, European Operations position" for him to assume after the merger. Id. at 2; see also Houston Pope Decl., Exhibit 31. In an email dated February 2, 2003, the Marketing Transition Coordinator restated her conclusion that "there will not be a position for [plaintiff] in the new Pfizer organization." Sainpy Decl., Exhibit G. She also reminded plaintiff that, as of that date, Pharmacia and Pfizer remained separate entities, and she informed him that she had referred his legal concerns to Pharmacia. Id.

The Pfizer-Pharmacia merger closed on April 16, 2003. Defendants' Statement Pursuant to Local Civil Rule 56.1 of Material Facts Not In Dispute ("Def Stmt.") at ¶ 22; Deposition of Marie-Caroline Sainpy ("Sainpy Depo.") at 184. Although Pfizer did not offer plaintiff a permanent position following the merger, he began a period of "provisional employment" with Pfizer on the date of the closing. Id. at ¶ 40; Sainpy Decl. at ¶ 13; Declaration of Maura Deleo In Support of Defendants' Motion for Summary Judgment ("Deleo Decl.") at ¶ 3. In that position, plaintiff exercised no business responsibilities. Rost Depo. at 456. The record shows that Pfizer's legal department retained plaintiff in this capacity "to avoid any complications that might have arisen" with regard to various legal matters it had inherited from Pharmacia, including Genotropian-related concerns and an action commenced by a former Pharmacia employee against plaintiff and the company. Deleo Decl. at ¶ 3.

Following the merger, plaintiff received his full Pharmacia salary amounting to more than

one million dollars. He was not, however, paid a bonus or issued stock options. Id. at ¶ 4. In exchange, plaintiff met with Pfizer's legal team regarding Pharmacia's earlier Genotropin marketing practices. Rost Stmt. at ¶ 83; Green Decl., Exhibit 31, 32. While provisionally employed by Pfizer, plaintiff also devoted a considerable portion of his time at home drafting a "tell-all" book on pharmaceutical company practice. Rost Depo. at 453-54.

In June 2003, plaintiff contacted the United States Department of Health and Human Services regarding Pharmacia's previous marketing practices. Rost Stmt. at ¶ 83; Green Decl., Exhibit 31, 32. Two days later, on June 5, 2003, plaintiff commenced a *qui tam* proceeding against Pharmacia and Pfizer. Rost Depo. at 52; Def. Stmt. at ¶ 44. Because the case was filed under seal, Pfizer only became aware of the action in February 2004. Complaint at ¶ 46. Plaintiff's provisional employment was not terminated at that time. See id. at ¶ 5.

In April 2004, plaintiff, through his counsel, requested that Pfizer once again consider him for various director-level positions within the company. Rost Stmt. at ¶ 86. In that same correspondence, plaintiff proposed that he and Pfizer enter into an agreement to toll the statute of limitations with respect to any claims they had against one another. Id. Pfizer did not offer plaintiff any director-level job or any other permanent position within the company. Complaint at ¶ 47; Sainpy Decl. at ¶ 14. However, plaintiff and Pfizer executed a tolling agreement, effective as of April 20, 2004. Houston Pope Decl., Exhibit 18. The parties agreed that their contract would be governed by the substantive law of New York. See id. at ¶¶ 5, 8.

On November 8, 2005, the United States Department of Justice announced that it would not intervene in plaintiff's lawsuit against Pharmacia and Pfizer. Houston Pope Decl., Exhibit 19. By letter dated December 1, 2005, Pfizer notified plaintiff that it was terminating his

provisional employment as well as the tolling agreement. Sainpy Decl., Exhibit H. In its termination letter, Pfizer explained, "Given that the government has formally and officially declined to intervene in your [*qui tam*] matter, we can now complete the severance of your employment, as we did with all the other Pharmacia employees for whom a position was not found." Id.

The record shows that plaintiff published a book entitled *The Whistleblower*, approximately nine months after his provisional employment with Pfizer ended. Rost Depo. at 441, 454. In his book, plaintiff disclosed confidential material over which Pfizer claims to exercise attorney client privilege. Rost Stmt. at ¶ 92; Declaration of Douglas Lankler in Opposition to Plaintiff's Cross-Motion for Summary Judgment at ¶ 4.

### SUMMARY JUDGMENT STANDARD

Under Rule 56(b) of the Federal Rules of Civil Procedure, a party may move at any time for summary judgment on all or part of the claim. Fed. R. Civ. P. 56(b). "[I]n assessing the record to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought." Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 36 (2d Cir. 1994). This Court must deny a motion for summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." See Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 465 (2d Cir. 2001) (citation and quotations omitted). Nevertheless, summary judgment is appropriate where the record "taken as a whole could not lead a rational trier of fact to find for the non-moving party." See Shan v. N.Y. City Dep't. Of Health and Mental Hygiene, 316 Fed. Appx. 23, 24, 2009 WL 707404, at * 1 (2d Cir. Mar. 19, 2009).

## NEW JERSEY CLAIMS

In his first two causes of action, plaintiff asserts claims under CEPA, the New Jersey "whistle-blower" statute, and for wrongful termination under New Jersey common law. See Pierce v. Ortho Pharmaceutical Corp., 84 N.J. 58, 417 A.2d 505 (N.J. 1980). To establish a CEPA claim, plaintiff must adduce evidence to show that he disclosed or threatened to disclose evidence of his employer's wrongdoing to "a supervisory or public body." See Fioriglio v. City of Atlantic City, 996 F. Supp. 379, 393 (D.N.J. 1998), aff'd, 183 F.3d 861 (3d Cir. 1999). Similarly, New Jersey's common law restrictions on "wrongful discharge" protect employees from termination "when the discharge is contrary to a clear public policy." See Pierce, 84 N.J. at 72, 417 A.2d at 512. Thus, to state a viable wrongful discharge claim under Pierce, an at-will employee must identify "a specific expression of public policy" which is violated by his or her termination.

The circumstances of Plaintiff's termination do not provide a basis for a "whistle blower" or common law wrongful termination claim. Plaintiff maintains that he engaged in protected activity "starting in October 2002" through the date of his complaint. Complaint at ¶ 51. However, nothing in the record indicates that plaintiff's 2002 presentations were disclosures made or threatened disclosures, to "a supervisory or public body" as required to state a CEPA claim. To the extent that plaintiff relies on his filing of a *qui tam* action in 2003 as protected activity, plaintiff must still establish that "a causal connection exists between the whistle-blowing activity and the adverse employment action" in order to survive summary judgment of his CEPA claim. See Dzwonar v. McDevitt, 177 N.J. 451, 462, 828 A.2d 893, 900 (N.J. 2003); Turner v. Assoc. Humane Soc., Inc., 396 N.J. Super. 582, 592, 935 A.2d 825, 831 (N.J. App. 2007) (same).

In this case, plaintiff was terminated nearly two years after Pfizer learned of his filing of a *qui tam* action. Therefore, the temporal relationship between his protected activity and his termination does not give rise to an inference that the two events were causally connected. Prior to the 2003 merger and consistently thereafter, plaintiff had already been informed that he would not be offered a permanent position in the Pfizer organization. See, e.g., Sainpy Decl., Exhibits F, G. It is clear that Pfizer had previously drawn unfavorable conclusions about plaintiff's future with the company before he filed the *qui tam* suit. See id. at ¶¶ 6, 8. Additionally, plaintiff admitted that following the merger, he did not exercise any business responsibilities and rarely, if ever, came in to Pfizer's offices. Rost Depo. at 456. The record shows that plaintiff's only post-merger work for Pfizer consisted of participating in several meetings with Pfizer's in house legal team. See Rost Stmt. at ¶ 83; Green Decl., Exhibit 32. The evidence also demonstrates that while provisionally employed by Pfizer, plaintiff devoted a considerable portion of his time at home drafting a "tell-all" book on pharmaceutical company practice which disclosed confidential material. Rost Depo. at 453-54; Rost Stmt. at ¶ 92. Thus, in light of the evidence showing Pfizer's legitimate reasons for terminating plaintiff's at-will employment, the record cannot support a finding that a causal connection exists between plaintiff's termination on December 1, 2005 and Pfizer's February 2004 discovery of his June 2003 filing of a *qui tam* action.

For the same reason, plaintiff's common law wrongful termination claim must also fail. The record contains no evidence of a retaliatory motive for plaintiff's termination. It clearly establishes non-retaliatory reasons for Pfizer's prior decision not to offer plaintiff permanent employment and, consistent with that prior decision, to later end his at-will employment. Plaintiff

-9-

has failed to identify "a specific expression of public policy" which is violated by his termination. Compare Pierce, 84 N.J. at 72, 417 A.2d at 512; see also Mehlman v. Mobil Oil Corp., 291 N.J.Super. 98, 123, 676 A.2d 1143, 1156 (N.J. Super. Ct. App. Div. 1996) ("The statute requires the employee to have reasonably believed that the employer's conduct had either violated a law, rule or regulation, or had been incompatible with a clear mandate of public policy"). Plaintiff here has cited no regulation or public interest implicated by Pfizer's decision to terminate his provisional employment.

## FALSE CLAIMS ACT

In his third cause of action, plaintiff contends that defendants Pfizer and Pharmacia violated the FCA by terminating his employment once "they learned in February 2004 that [he] had filed a *qui tam* action in June 2003," and after the Department of Justice refused to intervene in the *qui tam* suit. Complaint at ¶ 62. The FCA provides that employees who are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against" by their employers for taking actions to redress or expose violations of the FCA may commence a civil action to recover damages. 31 U.S.C. § 3730(h). "This 'whistle-blower' provision was intended to protect persons who assist in the discovery and prosecution of fraud, because few individuals will expose fraud if they fear their disclosures will lead to harassment, demotion, loss of employment or any other form of retaliation." Faldetta v. Lockheed Martin Corp., No. 98 civ. 2614, 2000 WL 1682759, at * 11 (S.D.N.Y. Nov. 9, 2000) (citation and quotations omitted). Logically, therefore, a viable FCA claim can only exist where an employer takes an adverse employment action *because* an employee engages in protected activity.

Accordingly, a cognizable FCA retaliation claim must be based on facts demonstrating

that plaintiff first undertook actions or made disclosures in support of FCA enforcement before being terminated. Plaintiff cannot premise a FCA retaliation claim on an investigation into his employer's "mere regulatory noncompliance" if that noncompliance does not "concern false or fraudulent claims" submitted to the government. See Hoyte v. Am. Nat'l. Red Cross, 518 F.3d 61, 68 (D.C. Cir. 2008); see also United States ex rel Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 234 (1st Cir. 2004) ("alleged violations of federal regulations are insufficient to support a claim under the FCA"); Faldetta, 2000 WL 1682759, at * 12 (dismissing FCA retaliation claim where plaintiff did nothing "beyond what was required of his position" and only investigated instances of noncompliance with federal regulations).

Plaintiff bases his FCA retaliation claim on Pfizer's decision to terminate his provisional employment on December 1, 2005, after the government declined to intervene in his *qui tam* suit. Complaint at ¶ 62. However, as stated supra, plaintiff had consistently been denied a permanent position on multiple previous and subsequent occasions. His provisional employment continued for close to two years after Pfizer became aware of plaintiff's lawsuit. His termination occurred more than a year after plaintiff advised Pfizer that he had spoken with federal regulators about the company's "possible commission of federal offenses." Id. at 48.

Plaintiff has failed to show that his expressions of concern about Pharmacia's regulatory noncompliance constituted activity protected by the FCA. He has not presented facts to demonstrate a causal connection between any protected activity and the termination of his provisional employment. Consequently, plaintiff's FCA retaliation claim is deficient as a matter of law.

## CONCLUSION

Defendants' motion for summary judgment is granted. Plaintiff's claims are dismissed.

Plaintiff's motion for partial summary judgment is denied as moot.

Dated: September 24, 2009
      New York, New York

*George B. Daniels*
George B. Daniels
United States District Judge

-12-